Filed 4/5/23  In re K.C. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

|  |  |
|---|---|
| In re K.C., a Person Coming Under the Juvenile Court Law. | |
| | D081171 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. J519962C) |
| v. | |
| F.E., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of San Diego County, Margie G. Woods, Judge.  Conditionally reversed and remanded with directions.

William D. Caldwell, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia G. Silva, County Counsel, Lisa M. Maldonado, Chief Deputy County Counsel, and Tahra Broderson, Deputy County Counsel, for Plaintiff and Respondent.

F.E. (Mother) appeals from the juvenile court's order terminating her parental rights as to her son, K.C. under Welfare and Institutions Code[1] section 366.26. She argues the juvenile court should have applied the beneficial parent-child relationship exception to adoption pursuant to section 366.26, subdivision (c)(1)(B)(i). She also contends the court's order must be conditionally reversed because the San Diego County Health and Human Services Agency (Agency) failed to satisfy its further inquiry obligations under the Indian Child Welfare Act (ICWA; 25 U.S.C. § 1901 et seq.) and California law adopted to pursuant to ICWA. The Agency maintains the juvenile court properly found that the beneficial parent-child relationship exception to adoption did not apply. It concedes, however, that conditional reversal is appropriate to ensure ICWA compliance. Agreeing with the Agency, we conditionally reverse the order and remand for the limited purpose of ensuring ICWA compliance.

FACTUAL AND PROCEDURAL BACKGROUND

In December 2021, the Agency petitioned the juvenile court under section 300, subdivision (b), claiming that K.C. suffered, or there was substantial risk he would suffer, serious physical harm or illness due to Mother's inability to provide regular care for him as a result of her substance abuse. The petition alleged that K.C. tested positive for amphetamine and methamphetamines in November 2021. Mother tested positive for the same substances and admitted using drugs during her pregnancy.

K.C. was initially allowed to remain in Mother's care on a safety plan because she agreed to attend substance abuse treatment. When she failed to do so, however, the Agency obtained a protective custody warrant for K.C. on

---

1   All undesignated statutory references are to the Welfare and Institutions Code.

December 3. K.C. was detained in a licensed foster home that same day. At the detention hearing three days later, the juvenile court found the Agency made a prima facie showing that K.C. was a person described by section 300, subdivision (b), and ordered him detained. It granted Mother liberal supervised visitation at a minimum of twice per week.

Three weeks later, the Agency reported that Mother had completed an intake for substance abuse treatment at KIVA. She had also visited K.C. twice a week, was attentive and loving during her visits, and the visitor monitors had no concerns. According to K.C.'s caregivers, he seemed to adjust well after his visits with Mother and he preferred to be held all the time.

By early February, Mother left KIVA due to a family emergency. Her visitation during this period was inconsistent. Meanwhile, K.C. was adjusting well to being with the caregivers and was also doing well in daycare.

K.C. was placed in a different foster home on February 18 and adjusted well. By mid-March, Mother had completed a drug treatment intake with Parent Care and was participating in parenting classes, but canceled or no-showed to four classes in February. Mother also no-showed to visits with K.C.

In May, the Agency reported that Mother tested positive for methamphetamine at her intake with Parent Care and she had not participated in treatment since then. K.C. was still thriving in his current placement and meeting all his developmental milestones. He was eating solid foods and formula throughout the day and loved to babble. The Agency indicated K.C. was healthy, growing, and a very happy baby. It recommended that he be placed in the current foster home, Mother be

3

granted supervised visitation, and Mother's reunification services be bypassed.

At the contested jurisdiction and disposition hearing on May 5, the court found that K.C. was a person described by section 300, subdivision (b), removed him from Mother's custody under section 361, subdivision (c)(1), and ordered that he continue his placement in a foster home. Pursuant to section 361.5, subdivision (b)(10)-(11), it determined that no reunification services would be provided to Mother and set a section 366.26 hearing.

Following disposition, Mother had seven visits with K.C. in June and July; all went well with no concerns. She played with K.C., did tummy time, and told him she loved him. During these visits, Mother was affectionate, loving, appropriate, and attended to his needs. However, she was again inconsistent with visits in August.

In the beginning of September, the Agency reported that K.C., who was 10 months old at the time, was still in the foster home that he had been in since February 18, and the caregivers wanted to adopt him. It characterized K.C. as a happy baby who did not display distress upon separation from Mother when visits ended and easily transitioned back to daycare or the caregiver.

Mother subsequently visited with K.C. once in September, which went well. She read him a book, showed him how to roll a plush soccer ball across the room, and motivated him to crawl with baby biscuits. At the end of the visit, Mother brought K.C. out to the car. When she strapped him into his car seat, he started to cry and Mother comforted him with his pacifier.

Mother attended two visits in October, during which she was attentive, engaged in appropriate play, and told K.C. she loved him. In its section

4

366.26 reports, the Agency recommended that the court terminate Mother's parental rights and order a permanent plan of adoption.

At the section 366.26 hearing on November 1, Mother explained that she attended the majority of her scheduled visits with K.C. to the best of her ability. While acknowledging that she missed visits, she testified that she saw him develop since birth and was involved as much as possible. She claimed K.C. knows who she is, he knows she is his mother, and they have an amazing time together. When she meets the visitor monitor outside and K.C. sees her, he has a "big surprise look" and stops crying. Mother testified that he hates being in the car and when she takes him out of the car seat, he immediately calms down. Also, in the last month, he started to notice a pattern and would start to get "antsy" with a worried look on his face when the visit is almost over. According to Mother, at the last three or four visits, K.C. started calling her "mama" at the end of the visit and it "makes it really difficult for the both of us." She emphasized that she loves him and he loves her, and she has built a relationship with him as much as she could. Mother believed that her relationship with K.C. was just like any other mother who loves and cares for her child from "a difficult stance," but when they are together, she is "a mother to him."

The Agency asked the court to find that K.C. was both generally and specifically adoptable and argued the beneficial parent-child relationship exception to adoption did not apply because Mother's visitation had not been regular and consistent. If the court were to find sufficiently regular visitation, the Agency contended there was no evidence of a substantial positive emotional attachment between K.C. and Mother, urging the court to take into account the amount of time that K.C. had been out of Mother's care—virtually his entire life—and his very young age. He was also in a

stable environment and had a relationship with his prospective adoptive parents. Thus, any relationship K.C. and Mother did have was outweighed by the benefits K.C. would receive through adoption. Minor's counsel agreed with and adopted the Agency's arguments.

Mother's attorney argued that the beneficial parent-child relationship exception to adoption should apply because Mother visited K.C. to the extent she could and had strong, positive visitation. She also argued K.C. would benefit from a continued relationship with Mother and it would be detrimental to sever the relationship because K.C. knew that Mother is his mother, he gets excited to see her, and he gets upset at the end of visits.

In issuing its ruling, the juvenile court observed that K.C. would be turning one year old in one week. It found that he was adoptable and moved on to the question of whether the beneficial parent-child relationship exception to adoption applied, stating:

> "So as far as visitation is concerned, the court would have to agree with the assessment of minor's counsel and the Agency's counsel that there has been visitation, but not one where the court can determine and find that the two other elements exist, that the child would benefit from continuing the relationship, and that terminating the relationship would [be] detrimental to the child."

Specifically, the court found that the evidence did not show "by a preponderance or by any other lower level," that K.C. had a significant positive emotional attachment to Mother. It also found that the preponderance of the evidence did not show that the harm of severing the relationship between K.C. and Mother would outweigh the benefit of K.C. being placed in a new adoptive home such that severing the relationship would be detrimental to K.C.'s health, well-being, or development. Concluding that the beneficial parent-child relationship exception to adoption

6

did not apply, the court terminated Mother's parental rights as to K.C. and ordered the permanent plan of adoption.

## DISCUSSION

Mother raises two issues on appeal, contending: (1) the juvenile court erred in failing to apply the beneficial parent-child relationship exception to overcome the statutory preference for adoption; and (2) the requirements under ICWA were not satisfied.

A. *The Beneficial Parent-Child Relationship Exception*

Mother argues that the evidence does not support the juvenile court's findings and that the juvenile court abused its discretion in declining to apply the beneficial parent-child relation exception. We conclude, however, that substantial evidence supports the court's finding that K.C. did not have a substantial, positive, emotional attachment to Mother such that K.C. would benefit from continuing a relationship with her, and the juvenile court was within its discretion to decline to apply the beneficial parent-child relationship exception.

" 'At a permanency plan hearing, the court may order one of three alternatives: adoption, guardianship or long-term foster care. [Citation.] If the dependent child is adoptable, there is a strong preference for adoption over the alternative permanency plans.' [Citation.]" (*In re B.D.* (2021) 66 Cal.App.5th 1218, 1224.) Once the juvenile court finds the child is adoptable, the burden then shifts to the parent to demonstrate that a statutory exception applies. (*Id.* at p. 1225; § 366.26, subd. (c)(1).) If the parent does not establish the applicability of a statutory exception, the juvenile court must terminate parental rights. (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 316 (*Katherine J.*).)

7

One such statutory exception is the beneficial parent-child relationship exception.  (§ 366.26, subd. (c)(1)(B)(i).)  It applies if "[t]he court finds a compelling reason for determining that termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship."  (§ 366.26, subd. (c)(1)(B)(i).)  This exception requires the parent to prove three elements:  "1) regular visitation and contact with the child, taking into account the extent of visitation permitted; (2) a substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship; and 3) a showing that terminating the attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home."  (*In re M.G.* (2022) 80 Cal.App.5th 836, 847.)

"We review the juvenile court's findings as to whether the parent has maintained regular visitation and contact with the child, as well as the existence of a beneficial parental relationship, for substantial evidence."  (*In re B.D.*, *supra*, 66 Cal.App.5th at p. 1225 [citing to *In re Caden C.* (2021) 11 Cal.5th 614, 639–640 (*Caden C.*)].)  We do " 'not reweigh the evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts' " and will not disturb the juvenile court's findings even where substantial evidence to the contrary also exists.  (*Caden C.*, at p. 640, citations omitted.)  "[T]he ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with [the] parent—is discretionary and properly reviewed for abuse of discretion."  (*Ibid*.)  A court abuses its discretion " ' " 'by making an arbitrary, capricious, or patently absurd determination.' " ' "  (*Id.* at p. 641.)

The Agency contends that although the juvenile court's finding regarding the first element was unclear, the record would support a conclusion that Mother failed to have regular visits and contact with K.C.[2] Mother argues that the juvenile court acknowledged her visits with K.C. and this court cannot imply a finding that she failed to satisfy the first element. She suggests we should reverse and remand the matter to resolve any unclarity.

Based on our review of the juvenile court's oral ruling, it is reasonably clear the court found that Mother satisfied the first element of regular visitation and contact with K.C., but that such visitation and contact was not enough to establish the two remaining elements of the exception. Because we conclude the court found in favor of Mother on the first element, and because we agree with the juvenile court on the second and third elements even with the first element in Mother's favor, we need not address the sufficiency of the evidence to support the first element nor reverse for clarification.

Turning to the second element—the existence of a beneficial parent-child relationship—the juvenile court must "consider the evidence showing whether the parent's actions or inactions 'continued or developed a *significant, positive, emotional attachment* from child to parent.' " (*In re B.D.*, *supra*, 66 Cal.App.5th at p. 1230 [italics added].) To determine whether the parent has established this element, the court considers factors including the age of the child, the amount of time the child spent in the parent's custody, the interaction between parent and child, and the child's needs. (*Caden C.*, *supra*, 11 Cal.5th at p. 632.) The court should also examine "how children feel about, interact with, look to, or talk about their parents." (*Ibid*.)

---

[2]    Significantly, the Agency does not assert there is insufficient evidence to find that Mother maintained regular visitation with K.C.

9

Here, substantial evidence supports the juvenile court's finding that K.C. did not have a significant, positive, emotional attachment to Mother. Notably, he was in her care only until he was three and a half weeks old. By the time of the section 366.26 hearing, he was just days from his first birthday. Although the record shows Mother had positive visits with K.C.— and according to Mother, K.C. did not want the visits to end—the reports also reflect that he did not display distress upon separation from her and adjusted well after the visits, transitioning easily back to daycare or the caregiver. Mother argues that at the beginning of visits, K.C. would immediately calm down when she took him out of the car seat; however, she also testified that he hated being in the car. Similarly, while she claims K.C. is extremely happy with her, the record shows that he was generally a very happy baby and very social.

Mother cites to her testimony that her visits with K.C. were amazing and contends the Agency's reports "are consistent with such loving and attentive relating." But the report to which Mother cites simply states that visitation monitors have reported that Mother "was attentive and loving towards the child during her visits. They have not expressed any concern." Although Mother may have been appropriate, attentive, and loving during the visits, the observations did not necessarily indicate that K.C. had a significant emotional attachment to her. (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 318.)

The third element of the beneficial parent-child relationship exception requires the juvenile court to determine whether terminating the parental relationship would be detrimental to the child. (*Caden C.*, *supra*, 11 Cal.5th at p. 633.) "[I]n assessing whether termination would be *detrimental*, the trial court must decide whether the harm from severing the child's

10

relationship with the parent outweighs the benefit to the child of placement in a new adoptive home. [Citation.]" (*Id.* at p. 632.) This requires the juvenile court to determine "how the child would be affected by losing the parental relationship—in effect, what life would be like for the child in an adoptive home without the parent in the child's life." (*Id.* at p. 633.) The juvenile court must then weigh the loss of this relationship with "the benefit of placement in a new, adoptive home . . . ." (*Ibid.*)

Mother argues the juvenile court abused its discretion because in weighing the harm of severing K.C.'s relationship with her against the benefit of a new adoptive home, the juvenile court assigned a benefit only to the adoptive home, and "failed to recognize the countervailing benefit of continuing [K.C.'s] significant, positive emotional attachment with [her]."

The juvenile court, found, however, that K.C. did not have a substantial, positive, emotional attachment to Mother, and we have concluded there is substantial evidence to support this finding. While this finding addresses the second element, the second and third elements of the exception "significantly overlap." (*Katherine J.*, *supra*, 75 Cal.App.5th at p. 317, fn. 7.) "For example, evidence that terminating the parental relation would cause harm indicates that the child would lose important relational benefits if severed from parent." (*Ibid.*) "When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, termination would be 'detrimental to the child *due to*' the child's beneficial relationship with a parent." (*Caden C.*, *supra*, 11 Cal.5th at pp. 633–634.)

Here, because K.C. did not have a substantial, positive, emotional attachment to Mother, there was no beneficial relationship between them. Mother does not point to facts or identify what benefits the court should have

11

but failed to assign to the continuation of K.C.'s relationship with her. The record further shows K.C. would suffer minimal harm from the termination that relationship. Again, while Mother testified that he would get "antsy" at the end of visits, reports indicate that he did not display distress upon separation from her and adjusted well after the end of a visit. Mother does not point to specific facts or detail how K.C. would suffer harm from the loss of a relationship with her.

On the other hand, the record shows that K.C. would derive great benefit from the permanency of adoption. He adjusted well to his first foster home where he was placed for two and a half months. His current placement with the prospective adoptive parents began on February 18, 2022. By the time of the section 366.26 hearing, he had been with them for almost nine months. The Agency reported that K.C. was thriving in his placement and meeting all his developmental targets. He was a happy and healthy baby, eating solid foods, sleeping well, and learning to self-soothe.

In sum, the record fully supports the juvenile court's ultimate determination that any harm that might result from termination of K.C.'s relationship with Mother was outweighed by the substantial benefits K.C. would receive through the permanency of adoption. Accordingly, the court did not abuse its discretion when it declined to apply the beneficial parent-child relationship exception to adoption and terminated Mother's parental rights.

## B. ICWA

Mother argues the Agency failed to comply with its further inquiry obligations under ICWA because it should have contacted the Bureau of Indian Affairs (BIA) and the State Department of Social Services (SDSS) for assistance in identifying potentially relevant tribes. She also contends that

12

because the Agency did not specify what information it included in its further inquiry communications with the Iipay Nation of Santa Ysabel (Iipay Nation), it is unclear whether the Agency provided the necessary information for the tribe to make a determination regarding K.C.'s possible Indian heritage.

The Agency responds there was no need to contact the BIA or the SDSS because the Iipay Nation was the only tribe implicated as a source of K.C.'s potential Indian heritage.  It concedes, however, it would have been better to submit copies of the written letters and emails that it sent to the Iipay Nation so there would be a record of the information on which the tribe relied to determine that K.C. was not eligible for membership.

We agree with Mother on both ICWA issues. The juvenile court's finding that ICWA did not apply to the proceedings implied that the Agency fulfilled its further inquiry duties.  (§ 224.2, subd. (i)(2); see *In re Austin J.* (2020) 47 Cal.App.5th 870, 885 [a finding that "ICWA does not apply" implies social workers and court "did not know or have a reason to know the children were Indian children and that social workers had fulfilled their duty of inquiry"].)  The record does not support these findings.  We therefore conditionally reverse and remand the matter for the limited purpose of ensuring ICWA compliance.

### 1. *Additional Facts*

The Agency initially reported that Mother indicated maternal grandmother was part of the "Digueno Mission Indians."  At the detention hearing, the court found there was a reason to believe K.C. may be an Indian child and ordered the Agency to conduct further inquiry under section 224.2, subdivision (e).

13

Mother then claimed she had Indian ancestry and that maternal grandmother and maternal aunt were registered tribal members. Maternal aunt reported that she was registered with Santa Ysabel Mission Indians and that she currently lived on the Sycuan reservation. Similarly, maternal grandmother indicated she was registered with the Santa Ysabel Mission Indians and grew up on the Sycuan reservation.

The Agency sent inquiries to the Iipay Nation by email and certified mail, and also attempted to contact the tribe by telephone, leaving a voicemail message. Although the tribe did not return the call, the Agency reported receiving a letter from the tribe stating that Mother and K.C. were not eligible for enrollment. At both the next hearing and the contested jurisdiction and disposition hearing, the court found that ICWA did not apply to the proceedings.

The Agency later reported that Mother's cousin claimed she had Indian heritage, but indicated she was not affiliated with a tribe. At the section 366.26 hearing, the court again found that ICWA did not apply to the proceedings.

### 2. *Applicable Law*

Congress enacted ICWA to address concerns regarding the separation of Indian children from their tribes through adoption or foster care placement with non-Indian families. (*In re Isaiah W.* (2016) 1 Cal.5th 1, 7.) Under California law adopted pursuant to ICWA, the juvenile court and Agency have an "affirmative and continuing duty to inquire" whether a child "is or may be an Indian child." (§ 224.2, subd. (a); see *In re Isaiah W.*, at p. 9.) As outlined by this court in *In re D.S.* (2020) 46 Cal.App.5th 1041, 1052, "section 224.2 creates three distinct duties regarding ICWA in dependency proceedings. First, from the Agency's initial contact with a minor and his

14

family, the statute imposes a duty of inquiry to ask all involved persons whether the child may be an Indian child.  (§ 224.2, subds. (a), (b).)  Second, if that initial inquiry creates a 'reason to *believe*' the child is an Indian child, then the Agency 'shall make *further inquiry* regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.'  (*Id*., subd. (e), italics added.)  Third, if that further inquiry results in a reason to *know* the child is an Indian child, then the formal notice requirements of section 224.3 apply."

After a "reason to believe" that an Indian child is involved has been established, further inquiry regarding the possible Indian status of the child is required.  (§ 224.2, subd. (e).)  The duty of further inquiry includes (1) interviewing the parents, Indian custodian, and extended family members; (2) contacting the BIA and the SDSS for assistance in identifying the names and contact information of the tribes in which the child may be a member, or eligible for membership; and (3) contacting tribes and anyone else who might have information regarding the child's membership or eligibility in a tribe; contact with a tribe "shall include" information identified by the tribe as necessary for the tribe to make a membership or eligibility determination.  (*Id*., subd. (e)(2)(A–C).)

"On appeal, we review the juvenile court's ICWA findings for substantial evidence."  (*In re D.S.*, *supra*, 46 Cal.App.5th at p. 1051.)  However, where the facts are undisputed, we independently determine whether ICWA's requirements have been satisfied.  (*Ibid*.)

    3.  Analysis

As the Agency contends, the only claims of Indian membership identified by the maternal family were with the "Digueno Mission Indians" and the "Santa Ysabel Mission Indians."  The Agency argues these claims

15

implicated only one tribe—the Iapay Nation—which was previously recognized as Santa Ysabel Band of Diegueno Mission Indians of the Santa Ysabel Reservation. (See 87 Fed.Reg. 4636-4640 (Jan. 28, 2022).) According to the Agency, the variation of the tribal names included in its reports reflect the change in one tribe's official name—the Iapay Nation.

However, there are seven other Federally recognized tribes with "Diegueno Mission Indians" in its name. (See 87 Fed.Reg. 4636-4640 (Jan. 28, 2022).) Additionally, maternal aunt reported she currently lived on the Sycuan reservation and maternal grandmother reported she grew up on the Sycuan reservation. While not addressed or acknowledged by the Agency, the Sycuan Band of the Kumeyaay Nation is a Federally recognized tribe. (*Ibid.*) Finally, Mother's cousin claimed she had Indian heritage but did not identify a tribe. Given these ambiguities, the Agency should have contacted the BIA and the SDSS for assistance in identifying tribes in which K.C. may be eligible for membership.

The Agency acknowledges it should have submitted copies of the letters and emails it sent to the Iipay Nation so the record would show what information the tribe relied on in determining that K.S. was not eligible for membership. Unlike when a "reason to know" gives rise to the obligation to provide formal notice to tribes, the statute does not require the Agency to file its communications with the tribes where there was only a "reason to believe" requiring further inquiry. (See § 224.2, subd. (e)(2)(C) [when there is a "reason to believe" a child is an Indian child, further inquiry includes contacting tribes by "telephone, facsimile, *or* electronic mail"], italics added; compare with § 224.3, subds. (a)(1), (c) [when there is a "reason to know" a child is an Indian child, formal notice "shall be sent by registered or certified mail with return receipt requested" and "[p]roof of the notice, *including copies*

16

*of notices sent and all return receipts and responses received, shall be filed with the court*"], italics added.) However, the statue does require that the Agency's further inquiry communications include information necessary for the tribe to make a membership or eligibility determination. (§ 224.2, subd. (e)(2)(C) [when conducting further inquiry, "[c]ontact with a tribe shall include sharing information identified by the tribe as necessary for the tribe to make a membership or eligibility determination"].) Without at least a summary in the record of what information it provided, there is insufficient evidence to support the trial court's implicit finding that the Agency conducted a proper and adequate further inquiry.

## DISPOSITION

The juvenile court's order terminating parental rights is conditionally reversed.  The matter is remanded to the juvenile court with directions for the Agency to comply with the further inquiry provisions of ICWA and section 224.2 (and, if applicable, the notice provisions under section 224.3) as discussed in this opinion.  If, after completing its further inquiry, neither the Agency nor the juvenile court has reason to know that K.C. is an Indian child, the order shall be reinstated.  If the Agency or the juvenile court has reason to know K.C. is an Indian child, the Agency and the juvenile court shall proceed in conformity with ICWA and related California law.


DATO, J.

WE CONCUR:


IRION, Acting P. J.


DO, J.

18